Tennenbaum Living Trust, NL v. GCDI, case number 23-1247. Good afternoon, Your Honors. May it please the Court, Victoria Bruno for Appellant, GCDI. Early on in the motion to dismiss stage, the District Court correctly ruled the indenture at issue, quote, always conditioned plaintiff's rights to obtain payment or bring suit in the event of a mandatory conversion. That phrase, or bring suit, encapsulates the purpose of manifest error clauses under New York law to foreclose legal challenges like this one by requiring courts to defer to the contract's delegated decision maker absent manifest error. That, however, is not what happened here. The District Court committed multiple legal errors in misinterpreting and misapplying the manifest error standard, which is settled law in New York and the plain language of Section 1301 of the indenture. The net effect of these errors was the District Court substituting its own judgment rather than deferring to the judgment of GCDI's Board of Directors, even though the indenture delegated to the Board final and conclusive decision-making authority to determine whether the Qualified Public Offering Threshold, or QPOT . . . Well, can I . . . I mean, Judge Cronin concluded that in assessing manifest error, he could look at all the materials that the Board had considered in basically announcing the fact that the $100 million was met and the conversion price, right? Correct. He looked at just the materials considered by the Board. So your view is that he was not permitted to look at those? That's extrinsic evidence? Or are you saying something different? No. That's not what I'm saying. I'm saying . . . So you're saying that he was free to look at all that stuff? He was free to look at the materials that were presented to the Board. What was the basis of the Board's decision, and those were the materials that he considered. What he got wrong is that the indenture delegated to the Board final and conclusive decision-making authority to determine whether the QPOT, conditions for a mandatory conversion of the notes into equity, were satisfied. The district court acknowledged that its interpretation of the manifest error standard, quote, would not control were it in conflict with the contractual language or with binding New York precedent. Let me ask you a question, a couple of different questions, because I've been trying to understand the precise argument. Do you agree that if market value, the market value of the shares, I guess it's the preferred A and B convertible shares, is that right, sold is the appropriate valuation method, then you don't get to the $100 million threshold? No, I don't agree with that at all, Your Honor. So you think that, you think that on this record, based on a market value of the shares sold, you get, you exceed $100 million. Forget about the impact on the balance sheet. What I'm saying is that fair market value is not the metric, but even assuming that it is, even assuming that it is, the plaintiffs, it was their burden. If that is the metric that this Court adopts as the metric that the plaintiffs are advancing, then the plaintiffs fail to meet their burden of proof to prove what the fair market value was. And it's their burden to do so, and therefore the... I'm sorry, go ahead. This is a big conditional. Set aside the burden for a moment. Is there anything in the record that you could rely on or point us to that would tell me that a market valuation of the shares sold exceeded $100 million? Because I think that you're relying entirely on the impact of the, on the impact of the, on the balance sheet here. Is that right? That is correct, and that is exactly what the Board did. And there is... Part of the reason that it did that was because, I take it, if you just did market value, it would not exceed $100 million. Now, I don't think that that's a fair inference based on the record that's presented. Neither party presented expert reports on fair market valuation. There was no competent admissible testimony from fact witnesses as to what the fair market valuation was. But if that's the metric, then it was plaintiffs' burden to establish that at trial, and there's an absence of proof... But you're not relying on market value. Pardon me? You're not, and more importantly, the Board did not rely on market value. That's correct, Your Honor, and they didn't have to. Under the New York precedent on manifest error, manifest errors are limited to those errors that are incontrovertible, which means not open to interpretation or not open to question. Here, Section 1301 left the question that the Board was supposed to answer was, was the QPOT threshold conditions satisfied? And under Hermant's case, which is finding precedent here in New York, and the Curacao case, that meant that the Board was delegated the authority, the final inclusive authority... Under what interpretation of Section 1301 was the Board permitted... Reasonable interpretation of Section 1301 was the Board permitted to avoid a market valuation based on the shares sold and instead rely in assessing whether the threshold had been satisfied on an impact of the balance sheet. What part of 1301 can I read to tell me that that's even within the realm of reasonable possibility? Because Section 1301 does not define the standard, the metric, as fair market value. It's deliberately broad, and that breadth is intentional, and that intentionality is consistent with the party's choice of adopting the manifest error standard. Under that standard, as long as there's no manifest error, and that is an error that is incontrovertible... Now, the Court here determined, already found, that the balance sheet method that the Board used was, quote, conceivable. And once the Board made that... Excuse me, once the District Court made the determination that that method was conceivable, that meant it's not incontrovertible. And therefore, the Court had to defer to the final and conclusive judgment of the Board. It was up to the Board to decide how to determine whether the $100 million condition had been satisfied. And that's the purpose of manifest error standard under New York law. It might seem narrow and confined, but that's the purpose. Let me ask you then a hypothetical question. Yes. Let's say that the 1301 provision... This is hypothetical, so just go with me. Clearly prohibited the use of evaluation method that looked at the impact of the balance sheet. And the Board, nevertheless, used that as its method of evaluation to determine that the threshold had been satisfied. Would that still be subject only to this very limited manifest error issue, or could the District Court, Judge Cronin here, have said, no, no, no, no, no, no, there's an interpretive error here? If the Section 1301 had expressly excluded the method that the Board chose to value, to determine whether the $100 million condition had been met, that would be a different situation. Well, would that be a manifest error? Well, it would. Well, perhaps it would have been a manifest error because it would have been incontrovertibly clear. How could it not have been? Yes. It would have been incontrovertibly clear that the Board did not do what it was supposed to do. But that's not what Section 1301 says here. It's deliberately broad. And it's designed to give substantial and final inclusive, conclusive authority to the Board to decide how to determine. Section 1301 does not, contrary to the District Court, Section 1301 does not define a question that the Board is supposed to answer beyond the overall question, was the QPOT met overall? This is the Curacao case, which is on all fours with this case. Once that determination is made, it's up to the Board to decide how to measure, what analysis to choose or not. And its determination is final and binding and must be deferred by the Court. The Court does not have the authority to create a new exception to analyze whether the Court asked the wrong question. That's where the District Court went wrong. That was the second error by the District Court. An erroneous interpretation by rewriting Section 1301 to insert a new exception that the new reports have already rejected. Were there public offerings here? There were public offerings, yes, Your Honor. On both the U.S. exchange and the Argentinian exchange? On the Argentinian exchange, yes. And how much was raised as a result of that public offering? I believe it, well, it depends on how you value it. According to the Board, it was $130 million. And on whether there was a public offering or not, just three points, Your Honor. The District Court was very skeptical of the plaintiff's argument that the — and considered it unnecessary to its decision. The plaintiff's argument is also contradicted by the terms of the agreement that the plaintiff's claim constituted the private sale. And, of course, GCDI's Argentine counsel concluded that the offerings were a public offering in Argentina. Plaintiffs presented no evidence at trial to contradict this conclusion, and plaintiffs don't challenge it on appeal. This is Judge Cronin speaking. Excuse me? Is that Judge Cronin? Those are his words? Or those are your words? These are my words. These are my words. Yes. It was not a — you're correct, Your Honor. This was not an issue that the Court took up and considered it necessary to its decision. So that's my argument. Well, thank you, Your Honor. I will wait for rebuttal. Good afternoon. Your Honor, it's Nathaniel Marmon for the appellee. May it please the Court, the company did not sell $100 million of equity, and it was manifest error for the Board to conclude that it did. In reaching that factual finding after a bench trial, the District Court applied the correct legal standard and its factual finding to the court. These findings are thus entitled to clear error review because the appellant has not even argued clear error. But what's — I guess I'm trying to figure out, what is the basis for saying that the fair market value as calculated by Judge Cronin is the proper way to do this, either by virtue of the language in 1301 or precedent that says that's what you have to do if you're going to be assessing, you know, the value of a new issue? That's an ordinary question of contractual interpretation, Your Honor. In other words, the Court looks at the language of 1301 that if the company sells $100 million of equity, the mandatory conversion takes place. And the Court, in its function of contract interpretation as a matter of law, interprets what that language means. And so the District Court looked at the language and said, $100 million sold by the company — It looked at the entire language of 1301. Yes. It looked at the entire language in context and said, $100 million sold by the company, that must mean for value of $100 million. As we argued in our brief, either that the consideration was $100 million or that the shares themselves had a value of $100 million. And indeed, there's really no dispute on this point. The District Court said — So in order to get at this manifest error issue, Judge Cronin had to interpret Section 1301. That's correct, Your Honor. And so that's the puzzle here, because the manifest error standard really applies very narrow, it seems to me. And it's not really designed — not really. It's not designed at all to be an interpretive tool. Correct, Your Honor. So what happened here? Why was he allowed to look at 1301 in connection with resolving the dispute? 1301 in context, as you put it. The language of what we'll call the manifest error provision says that the Board's determination is conclusive, absent manifest error, I'm paraphrasing. The question, the fundamental question is, what determination? Now, we argued in our brief that the only determination that the Board actually needs to make under the plain language of Section 1301 is the conversion price adjusted as of the date of the qualified public offering threshold being met. So that's the only determination. Why do I say that? Because the language of the provision is that the mandatory conversion is automatic. The word automatic is in Section 1301. If this happens, the shares automatically convert. The Board had no determination to even make as to that threshold issue. But even if it did make a determination about whether $100 million had been sold, that's the determination that the Board had to make. Not what it means to sell $100 million, right? There's an interpretive issue that's left to the Court as it would be in any case. But I'm just trying to figure out why it is or what is your authority for saying that the Board was not free to say that basically a dollar of debt from the note holders is equal to a dollar of Class B securities? That was a factual finding, Your Honor, that the District Court made, and for good reason. The District Court articulated that $100 million sold by the company means for value, $100 million of value. In Appellant's brief, Appellant agrees with that articulation. The Appellant conceded the point saying, quote, as relevant here, that means only whether the value of the offerings was at least U.S. $100 million, unquote. That presumes, I think, then that every initial offering is going to be by definition then what the face value of the purchase is. I would imagine if a company has enough debt like this one did, the Class A stockholders would have had shares that were worth less than the face value, no? In this offering, there were two types of shares sold, the Class A and the Class B. You seem to be suggesting that an investor is not allowed to basically pay more because they think that this is going to be worth more. I mean, you seem to be basically saying after the fact, we're going to decide whether this was worthwhile. No, Your Honor, that's not what we're saying. What we're saying is the consideration that was exchanged was not worth $100 million, and I'll explain. As to the Class A shares, those were purchased with cash and with in-kind real estate. That was worth $39 million. I mean, the consideration that was given was worth $39 million. But the in-kind, you're saying that Judge Cronin would have been free to assess whether that was worth $25 million, too? Well, as to the in-kind, he assessed that the value was $25 million. It just seems like we've got a judge sort of taking the place of the Board, which seems to be not the purpose of the Manifest Error Rule. But let's get to the Class Bs. Yeah. So, and Your Honor, the judge looked at what the Board, at the information that the Board considered and agreed that as to the Class A shares, there was $39 million of value exchanged. As to the Class Bs, the exchange was Class B shares for the notes that had been sold by the company, which was a company in distress. That's why they were doing the Class A and Class B shares. But if the company comes out of distress, without this infusion of $100 million, those notes are going to be worth every penny that's on their face, right? If it comes out of distress, then these things are worth a dollar for a dollar. Well, at some future point, theoretically, yes. In this case, no, because the Class B shares were also automatically converted into equity. And on the date when they were converted, right, on the date when they were converted, the equity wasn't worth $100 million. That manifests from the conversion of the Class A and Class B shares. When does the Board make its determination compared to the conversion of the Class B shares, preferred shares? When the Board determined that there had been a sale of $100 million of equity, that automatically converted the Class A shares into equity, the Class B shares into equity, and the remaining notes of the holdouts into equity. So all of that outstanding preferred shares and debt was converted into equity on that date. And the Class A and Class B shares... February 10th of 2020. Correct. February 10th, 2020. So what is wrong with having evaluation? Set aside for a moment the language of 1301. What is wrong with engaging in evaluation that looks at the impact on the balance sheets here, particularly when it's trying to get out of distress, as you, Sullivan, mentioned? And as I understand it, the whole purpose was to take all of this debt off of its balance sheet. So why can't the Board consider that as the important method of evaluation in this case? I would articulate it as the wrong formula. The question presented to the Board under the plain language of 1301 is whether the company sold $100 million of equity. And rather than answering that question, were the shares sold worth $100 million, the Board answered a different question. Was the change in net equity for the shareholders as a result of that sale $100 million? That's the wrong... It's answering the wrong question. And the reason why the change in net equity is not the right question to answer... To be clear, it seems to me that what you're saying is that they can't ever do Class B shares that would convert the notes into equity. I'm not saying that, Your Honor. If they had received $100 million in consideration for Class B shares actually worth $100 million, that would have triggered. The Class B shares are by definition not cash. They are in kind. They are trading a note for Class B stock, right? Yes. And so it seems to me what you're saying is that the note has to be valued for you to assess whether this is $100 million in total. There needs to be some appropriate mechanism for valuing the shares being sold, either the consideration paid... So one is the face value of the note, which you're saying is not appropriate. Another would be the secondary market value of the notes, which there's nothing in the record about that at all, I don't think. They're probably worth pennies. And the third is what Judge Cronin and I think you were saying is a fair market value assessment of the shares after conversion. That's one way of looking at it. I don't think that Judge Cronin said that's the only way to assess the value. What Judge Cronin said, and we agree, is the change in net equity is not a proxy for value. The liquidation preference is not a proxy for value. And the Board had no appropriate measure of value in front of it when it made the determination as to the value of the shares, other than the memo from Davis-Polk, which said these things aren't actually worth the consideration paid and the market value. This is Davis-Polk's words in their memo. So Davis-Polk, I mean, was a little more equivocal than that. Well, it described... I think it might have said the argument could be made that the consideration paid and the market value are not $100 million, and then it... It anticipated the argument that you're making. Yeah, and then it explained why the market value and the consideration paid were not... So that means it's a manifest error, because Davis-Polk could anticipate this argument. It must have been a manifest error. Davis-Polk was explaining the facts that showed that the actual market value was not $100 million. I think what's hard to do is that the only way to do this, at least of the three that I offered, is the one that Judge Cronin settled on. And I think what Ms. Bruno is saying is that, no, the board gets to sort of pick another one, and this asset-sheet swap is justifiable. And so what... I guess I'm trying to figure out, what is the authority in 1301 or under the law that says, no, that's a crock? You used the language in your brief of a peppercorn. What is there to suggest that this is the equivalent of a peppercorn? Well, first, what Judge Cronin was doing in his decision was applying principles of contract interpretation. So there are principles of New York law, Hermann's and its progeny, that he applied in understanding manifest error, but he also engaged in contract interpretation. And then in that context, he said, the meaning of $100 million sold by the company is the value of the shares. And he continued, in what I regard as a factual finding, that the board did not have a sufficient basis, had no basis for concluding, and it was manifest error to conclude that the shares actually were worth $100 million, because the metrics that it used are not measures of value. I mean, manifest error, again, sort of a calculation error, right? But this is not really what Judge Cronin was getting at. It was a much bigger error. It was an interpretive error of what the board could select among different valuation methods. And he took at least one of them completely off the table and said, it's only this method of valuation that 1301 contemplates. Is that fair? I think that is fair. And let me give an analogy, if I may. If the board were asked to do a physics problem, what is the acceleration of an object? And instead of using the formula for acceleration, they plugged in the formula for velocity. You would get an answer that looked kind of on its face, correct. You apply the formula. But it manifestly would not answer the question of the acceleration of the object. That is what Judge Cronin is essentially saying here. But 1301 just says 100 million sold. It doesn't say for value, for fair market value, for the things that you're using as proxies. And so I guess that's the question. What is the authority for saying that's the only way that this section can be interpreted? It's a question of contract interpretation. And the question essentially is, what is the alternative objective measure that is written into those words? Judge Cronin decided that the objective words mean at least the value of 100 million. Otherwise, it's a... Why do you think it has to be an objective measure? I guess that's what I'm not sure about. Well, number one, because the provision says that it happens automatically. So if you have an automatic trigger in a contract provision, presumably that is an objective standard. If the board had said, the minutes show the board said, look, we've only got 80 million here, but that's close enough. So we're going to declare that we've hit our mark and we're now going to do the conversion. That would be a manifest error. Easy. What you're saying is that the board's conclusion as to how you get to 100 is not permissible. That is not a lawful interpretation of this provision. And I guess I'm not sure why you keep saying that's a contract interpretation. Yeah, I guess it is a contract interpretation. What is it about the alternative contract interpretation made by the board that is manifestly erroneous? Can you cite to a case? Can you cite to anything that says this is the equivalent of saying 80 million is the same as 100 million? I don't have a case for that proposition, but two points. Number one, the manifest error provision does not give the board the authority to determine the meaning of the words in 1301. But that is a threshold issue of contract interpretation for the court. Now, in cases cited by appellant, the Yonkers contracting case, for example, you have broader delegations of authority under a manifest error type situation where they said the chief engineer has the authority to decide all disputes under the contract, which would encompass interpretation of the contract language. That's not what happened here. Here, it was a very narrow delegation of manifest error authority to the board, which was just the board's determination shall be conclusive. That is not sufficient language, respectfully, to give the board the authority to take the court's role of interpreting the language of 1301. That is a role for the court, fundamentally. So it's an interpretive, really, where the dispute is about interpretation of 1301, not really about manifest error. Because what you're saying, and this is what I understood, is that if you've got the interpretation of 1301 wrong, if you've interpreted it in the wrong way with respect to evaluation method, then everything else is necessarily going to be manifestly wrong.  Correct. And I would also say that Judge Cronin found that using the wrong, like interpreting 1301 to allow for value based on change in net equity or liquidation preference, that that was also a manifestly erroneous interpretation of the standard. And does he say that any other interpretation that is an interpretation that permits for evaluation using the impact of the balance sheets is clearly not a reasonable interpretation of 1301? Does he affirmatively say that? I'll read you what he said. Quote, in determining that the qualified public offering threshold was met, however, the board relied primarily not on the value of the shares, but on other quantities, including the balance sheet impact of the offerings and the aggregate liquidation preference of the shares. Such reliance was error, ellipsis, its errors furthermore were manifest, unquote. So there's a little bit of interpretation to do in terms of what Judge Cronin, yeah. But as I read it, Judge Cronin was saying, as a factual matter, value does not equal change in shareholder equity. As a factual matter, value does not equal liquidation preference. And he's making a factual determination. So we need to interpret the contract in the same way, presumably, that Judge Cronin interpreted section 1301. And for you to prevail, it would be to exclude a reading or interpretation of 1301 that would allow for a valuation based on any other value. Actually, any other valuation would have to be excluded. Because you're relying on just one interpretation, which is the valuation just based on proceeds from the sale of a public offering of these shares and with the equity interest attached. Is that right? It's very close. I would disagree in two respects. Number one, the trust would agree that another valuation methodology other than just market valuation could be appropriate had it been used. The board manifestly did not know the value of the shares as its president testified. And they did not obtain a valuation. Had they obtained some actual valuation, that would be a different question. Here, they relied on things that manifestly did not relate to the value of the shares and were just other financial metrics. That's number one. Number two, the court can still affirm for other reasons, including that the actual scope of manifest error should only extend to the conversion price. That's the only determination that the board really needs to make under 1301. The rest is automatic. And so the company has argued for a broader discretion. That is the thrust of the company's argument, is that the board is entitled to discretion over everything. But the language suggests a much tighter. The last antecedent is really conversion price as adjusted. Conversion price being $1 for class A, $0.33 for class B. Is that basically it? There's a formula in the original indenture, I'm going to say. It's a JA 1100, somewhere around there. There's, I think it's 1304, has a conversion price formula. It's two, three pages. It's quite complex. So that is the thing the board needs to do. Once there's an automatic conversion, somebody needs to sit down and run the calculations, which depend on a number of different factors. Do you, let me just, sort of a slight housekeeping matter, analytically for me at least. Do you dispute that if the board were permitted under section 1301 to use the impact on balance sheet valuation method, and there's some stuff in the record at 16, you know, the board sheets in 1671 that it had available to it, do you dispute that if it could do that, then the threshold was satisfied? Do we dispute that if it was allowed to look at and change in shareholder equity?  The change in shareholder equity. Negative 53 to 78 or whatever million dollars. The math works in favor of the board if that is a permissible proxy for value or a permissible methodology for determining whether a mandatory conversion had been triggered. Appellee's position is that it is not. The court can also affirm because the company applied this all retroactively to public offerings that occurred before the amended indenture even took place. And at that time, when the first, when the original indenture was still the governing indenture, they needed to do a U.S. IPO, which they didn't do. So that is a separate reason for affirming. The district court did not address that argument or any of the other alternative bases because it found that there was manifest error. And so we've raised them for the court under your de novo review. Well, I mean, if you're right about this, if we agree with you about this, why would any note holder have done what they did? And it seems strange to me that, I mean, so there are note holders who did take the class B purchases and others who didn't. And so are there any, there's nobody, your clients didn't buy class Bs, right? Yeah, just step back and I can't give you record citations for this, but I'll explain to you what happened. There was a negotiated restructuring with significant note holders. So they all got together and said, the company is in financial distress. And this is all in the record and it's all in our briefs. There's financial distress. Let's agree to do something to put the company in a different financial position. Which is the only way these notes are ever going to get paid off. Possibly. Well, wait, if the whole thing goes under and the note holders take priority, but there's really nothing there, it's not worth much, right? You're not getting a dollar of value on those notes, are you? I would agree with you that even today, the company needs to be in a better financial position. And again, we're a little outside the record here. But the note holders who did not agree to this restructuring and did not exchange their shares for Class B shares, presumably took the position that this is not the best way to restructure the company or bring it back to financial health. They may have thought that they had a better idea or that there was something else that would come along, but they didn't participate. And so the trusts did not participate in the Class B offering. They also did not vote in favor of the amendment to the indenture. So I didn't hear what you said. Oh, never mind, never mind. I understood all that. Thank you. Okay. Thank you very much. Thank you for so much time, Your Honors. Your Honors, I have six points that I submit form the decision tree that this Court should follow. Six? Two minutes.  But I will be brief. And I think it's in order that this Court should follow to be consistent with binding New York law. One, manifest error is narrowly confined to only that which is incontrovertible, meaning not open to question, judgment, or interpretation. Two, the District Court determined that the Board's method of looking at the balance sheet impact was, quote, conceivable. That's at JA 1806, meaning one among many possible methods. In other words, not incontrovertible. And once the District Court made that determination, it was bound to defer to the Board's decision as final and binding, full stop. And that is the same language used in the Curacao case. Third, at that point, courts cannot then go on to review the decision-maker's determination for substantive correctness. As the District Court recognized, quote, for manifest error clauses to properly serve their function, they must preclude courts from reexamining the substantive correctness determination. Here, the District Court found, quote, no error in the Board's computation of how the offerings increased defendants' and shareholders' equity. Fourth, the corollary to no review for substantive correctness is that manifest error clauses make no exception for challenges that the decision-maker did not perform a different preferred analysis. The Curacao case forecloses... If it is the wrong analysis... Pardon me? If it is, I mean, the argument is, if it's the, you heard the physics analogy, if it's the wrong analysis, just full stop, then necessarily whatever is a result of that completely wrong analysis is manifestly erroneous, no? Yeah, it was... Would you agree with that? Yes, but it's only, only if the contract specifies explicitly that that is not the method that the Board is allowed to use. You're relying on this conceivable, the District Court itself acknowledged that it was conceivable that this impact analysis evaluation was appropriate. That's correct, and both the plaintiffs and GCDI and the District Court offered up many interpretations, many ways of evaluating the $100 million condition, which in and of itself sort of proves the point that there's no one single method. Now, the Curacao case forecloses the District Court's analysis. The inspector in that case, his task was to determine the overall quality of the fuel oil, but how to do that and what analysis to perform or not was for the inspector to decide in its final and conclusive judgment, and that's the exact same situation here. Fifth, Section 1301 does not define the question the Board was supposed to answer, other than the overall question of whether the QPOT was satisfied. And sixth, Section 1301 cannot be rewritten to insert fair market value. The question was valuing the shares, correct? Yes, and value is open to interpretation. What we have here is a sale, and a sale means an exchange of one thing for another of value. So the question, I think, is a little different. What, how do you value that exchange? And that is open to interpretation. The Court used the widget analogy. The Court said, ordinarily, if you say that you've sold $100 million worth of widgets, then they're worth $100 million. Ordinarily, but ordinarily isn't only or always. An ordinary usage or meaning is not the test. The test is manifest error, which applies when there's only one incontrovertibly correct interpretation. What was the purpose of employing the impact on the balance sheet valuation? The purpose was to improve the financial stability of the company. That was the purpose of the restructuring and the purpose of the sale, and that's what happened here. The company was in distress, and the company decided that it needed to fix its financial problem, and that's what happened here. The financial stability of the company improved because they brought in $124.3 million worth of debt obligations. Those are real legal obligations. We know that. That's the whole reason that we're here today, because the plaintiffs submit that the value of the convertible notes that they have is the face value. That in and of itself is another way to conduct an analysis on the value of the shares. We know that, and we also know that because the district court's judgment itself, which calculated interest to be earned, calculated that interest at the face value of the convertible notes. So by bringing in $124.3 million of this debt obligation and eliminating that— So that's sort of a proxy of the equity interest that was sold. Yes, exactly. That's what you're saying. Yes, it could be a mirror image. It doesn't have to be a mirror image, and that's the point. Value is open to interpretation, and the way the board did it in this case was within its final and conclusive judgment to do. One note, Your Honor, with regard to the scope issue. It's in our papers, but I do want to make an additional point. We don't agree that the manifest error is limited only to the conversion price, and we explain that in our papers. I want to make one additional point. Even if the manifest error standard applies to conversion price, that calculation also depends on the QPOT conditions being met. So either it applies to just the QPOT conditions, or it applies to both the conversion price and the QPOT. In either way, GCDI prevails on the scope issue. And lastly, Your Honor, I would like to address a couple of points that my colleague made. He mentioned that the board, there was no evidence that the board knew what the value was. And that essentially is a bad faith argument. And as we explained in our papers, bad faith claims were dismissed very, very early on, although plaintiffs made... The issue of good faith is not before us. The issue of good faith is not before the Court. No. Thank you very much. Thank you, Your Honor. Thank you all.